[No. 43981.    En Banc.    January 9, 1976.]

MUNICIPALITY OF METROPOLITAN SEATTLE, ET AL, *Petitioners*, v. ROBERT S. O'BRIEN, *as Treasurer of State, Respondent.*

340

*James R. Ellis, David L. Beller, Preston, Thorgrimson, Ellis, Holman & Fletcher, Robert R. Hamilton,* and *Richard F. Wrenn,* for petitioners.

*Slade Gorton, Attorney General,* and *Philip H. Austin, Deputy,* for respondent.

*Gordon L. Walgren* and *James K. Sells* on behalf of City of Bremerton, *Allen J. Hendricks* on behalf of City of Everett, *J. Gaylord Riach* on behalf of City of Lynnwood, *William F. Hennessey* on behalf of City of Mountlake Terrace, *Ernest L. Meyer* on behalf of City of Olympia, *Jerry F. King* on behalf of City of Vancouver, and *Fred H. Andrews* on behalf of City of Yakima, amici curiae.

BRACHTENBACH, J.—This is an original petition in the Supreme Court seeking a writ of mandamus to require the respondent State Treasurer to remit to petitioners certain tax proceeds to be used for public transportation purposes. The writ shall issue.

The petitioners are the Municipality of Metropolitan Seattle (hereinafter referred to as Metro), the Cities of Spokane and Tacoma. Also joining as petitioners are the holders of bonds issued by Metro. Counsel for numerous other

municipalities,[1] as amici curiae, have filed briefs in support of petitioners' action. The complex issues raised by this petition have been well briefed and ably argued by all parties.

The fundamental question is whether the Treasurer must remit to petitioners and others certain motor vehicle excise tax funds (described in more detail later) without a specific legislative appropriation. Four issues are involved in the resolution of this matter.

1. Are the subject funds governed by Const. art. 8, § 4 (amendment 11),[2] *i.e.*, are they state taxes payable only upon appropriation?

2. Does the 1975 appropriation act which diverted most of the subject funds to another purpose violate Const. art 2, § 37,[3] as to the subject funds?

3. Does the 1975 appropriation act violate Const. art. 2, § 19,[4] as to the subject funds?

4. Does the failure of the State to remit the subject funds to Metro constitute an unconstitutional impairment of the contract between Metro and its bondholders?

Some factual background and rather detailed and complex legislative history are necessary to a consideration and resolution of the precise issues confronting the court. We start with the fact that a decade ago the legislature ac-

---

[1] Cities of Bremerton, Olympia, Vancouver, Mountlake Terrace, Yakima, Lynnwood and Everett.

[2] "No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within one calendar month after the end of the next ensuing fiscal biennium, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum." Const. art. 8, § 4.

[3] "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." Const. art. 2, § 37.

[4] "No bill shall embrace more than one subject, and that shall be expressed in the title." Const. art. 2, § 19.

knowledged the urgent need for urban, public transportation systems. In 1965, the legislature declared:

> We further find and declare that the maintenance and operation of an adequate public transportation system is an absolute necessity and is essential to the economic, industrial and cultural growth, development and prosperity of a municipality and of the state . . .

Laws of 1965, 1st Ex. Sess., ch. 111, § 1, p. 2049, at 2050. (RCW 35.95.010). The legislature reiterated that concern, need and their support in 1969 and 1971. Laws of 1969, 1st Ex. Sess., ch. 255, § 1, p. 2365, at 2366; Laws of 1971, 1st Ex. Sess., ch. 296, § 1, p. 1678.

The 1965 act authorized municipalities to appropriate their general funds and to levy and collect local business and occupation taxes and certain other excise taxes, commonly referred to as "household taxes," for municipally operated public transportation systems. RCW 35.95.030-.050.

The funds generated from the 1965 taxing authority apparently, however, did not provide sufficient revenues for this "absolute necessity." To meet the growing need for adequately financed public transportation systems, the 1969 legislature enacted the taxing, collecting and remitting scheme which controls our decision. Subsequently, in 1971, 1973, 1974 and 1975, the legislature made substantial policy changes in its approach to the financing of public transportation,[5] but the basic framework of the 1969 act

---

[5] In 1971, the legislature authorized, within certain temporary limits, a local sales tax to be used as a qualifying local tax source. Laws of 1971, 1st Ex. Sess., ch. 296. (RCW 82.14.045.)

In 1973, the 1969 act was expressly amended to limit the amount of taxes which could be levied during the 1973-75 biennium. More importantly, the 1973 act contained a series of sections expressly amending or repealing the local tax levy sections of the 1969 act. These amendments were not to become effective until June 30, 1981. On that date the municipalities were to complete planned transit improvements and retire any bonds. The authority of all municipalities to levy the 1 percent motor vehicle excise tax would be terminated and a system of biennial state appropriations substituted therefor. Laws of 1973, 1st Ex. Sess., ch. 136. (Two versions of RCW 35.58.273 through 35.58.2793 were codified, one labeled "Effective June 30, 1981" and the other labeled "Effective until June 30, 1981.")

remains intact so far as the issues of this case are concerned.

Before examining the 1969 act, it is essential to set out the general scheme of the state motor vehicle excise tax, for it is a portion of that tax which is involved here. For a number of years the State has levied an annual excise tax on the fair market value of motor vehicles. Each owner of an automobile pays an excise tax equal to 2 percent of the fair market value of his vehicle to license the vehicle. RCW 82.44.020. The tax is collected through the office of the county auditor or through the auditor's designated agents. RCW 82.44.060.

Speaking generally and summarily, the 1969 act authorized the municipalities to use a portion of this state motor vehicle excise tax *solely* for the operation and development of public transportation systems. This is not an additional motor vehicle excise tax, but rather is a portion of revenues generated and contained within the statutory 2 percent. To qualify, however, for a share of this tax, the municipality must apply at least an equal dollar amount from its general fund or from revenues generated by local taxing measures. RCW 82.44.150(5). The magnitude of the local matching funds is illustrated by the fact that the taxpayers of Metro have paid in excess of $35 million for its matching share in the past 3 years.

Now let us examine the structure, scheme and substance of the taxing authority, levy power, collection procedures, remission process and purposes of the 1969 law. These are the words of the legislature:

> [A]ny municipality is authorized to *levy and collect* a *special* excise tax not exceeding one percent on the fair

In 1974, the legislature abolished the old motor vehicle excise fund, into which the proceeds of the RCW 35.58.273 motor vehicle excise tax had been paid, and transferred all its assets to the state general fund. Laws of 1974, 1st Ex. Sess., ch. 54 (amending RCW 35.58.278 and 82.44.150).

In 1975, the legislature expressly repealed those sections of the 1973 act which would have changed the transit assistance program into a system of biennial appropriations after 1981. Laws of 1975, 1st Ex. Sess., ch. 270.

market value of every motor vehicle owned by a resident of such municipality . . .

(Italics ours.) RCW 35.58.273.

When remitting license fee receipts . . . the county auditor shall at the same time remit the special excise taxes *collected for the municipality* and, subject to the provisions of subsection (2) of RCW 82.44.150, the sum so collected and paid over on *behalf* of the municipality shall be credited against the amount of the tax the auditor would otherwise be required to collect and pay over to the director of motor vehicles . . .

(Italics ours.) RCW 35.58.277.

Distribution of the special excise taxes paid into the general fund on *behalf* of any municipality *shall be made* to such municipality as provided in RCW 82.44.150 . . .

(Italics ours.) RCW 35.58.278.

All taxes levied and collected under RCW 35.58.273 shall be credited to a special fund in the treasury of the municipality imposing such tax. Such taxes shall be levied and used solely for the purpose of paying all or any part of the cost of acquiring, constructing, equipping or operating a publicly owned mass transportation system, or contracting for the services thereof, or to pay or secure the payment of all or part of the principal of or interest on any general obligation bonds or revenue bonds issued for public transportation capital purposes . . .

RCW 35.58.279.

RCW 82.44.150, which contains the statutory formula for the distribution of the state motor vehicle excise tax, mandates the state to apportion and distribute a portion of that tax as follows:

The amount required to remit to a municipality the proceeds of the tax authorized under RCW 35.58.273 *shall be remitted to the municipality levying such tax.*

(Italics ours.) RCW 82.44.150 (5).

■■ Under these statutes the legislature has directed the municipalities to make a series of local decisions con-

cerning municipally owned transportation systems. Whether to levy or not to levy the tax is a local decision, the amount of the tax levied is a local concern subject to the statutory ceiling, the investment of the tax proceeds and their application to either capital or operating transit purposes is a local matter and, finally, whether to pledge the tax to secure bonds is a matter for local determination. Having once made the initial decision to levy and collect the tax, what then are the consequences to the levying municipality? Are the municipalities subject to the largesse of the legislature because of the applicable constitutional provision, article 8, section 4, which requires a legislative appropriation for state funds. We think not. Arguably the literal language of the constitution would require a legislative appropriation to disburse any funds from the state treasury under the express words of that article. However, for many years, there has stood the commonsense interpretation by this court that the Treasurer may be made custodian of particular funds of a proprietary nature which are held for a specific purpose. Funds so held are distributable without specific legislative appropriation. In *State ex. rel. State Employees' Retirement Bd. v. Yelle*, 31 Wn.2d 87, 195 P.2d 646, 201 P.2d 172 (1948), the court discussed and analyzed prior decisions on this subject. At pages 106-07, the court said:

> [I]t is indisputable that, in establishing such a system [the retirement system for state and municipal employees], the legislature could elect to create a fund for that purpose either (1) by making such fund a *state fund* to be placed and kept in the *state treasury*, under the control of the state treasurer and the state auditor, and disbursable only in pursuance of an appropriation as provided by Art. VIII, § 4, of the constitution, or (2) by making the fund, in whole or in part, a special one, of a proprietary nature and designed to meet certain specific objectives, which fund is to be placed in the custody of the state treasurer acting *ex officio* as a member of the retirement system rather than in his constitutional capacity, and which is to be expended as directed by the legislature without a specific appropriation.

> The mere fact that the state treasurer may be made the custodian of a particular fund and may be required to render certain services with respect to such fund, does not of itself make the moneys so received and held by him *state funds in the state treasury*. Except in cases where the constitution requires that moneys be paid *into the state treasury*, as, for instance, taxes for state purposes, which moneys may be paid out only pursuant to an appropriation by law, the legislature has authority to determine the nature, the place and character of custody, and the requisites for the expenditure of a fund created by it.

The court distinguished those cases which respondent relies upon in defending this action. We find those distinctions applicable here.

In *Yelle*, the court acknowledged that the legislature did not expressly declare that the fund involved was not a state fund or that it had to be segregated and set apart. The same is true here. However, the *Yelle* court examined the act before it in its entirety and found a legislative intent not to create a state fund. With that guideline we return to the 1969 act. We repeat that it is the municipality which is authorized to *levy* and *collect* the *special* excise tax. RCW 35.58.273. The legislature utilized the existing scheme of collecting this tax through the county auditor, but directed the auditor to "remit the special excise taxes *collected for the municipality*" and to credit this amount "*collected and paid over on behalf of the municipality*" against the amount which he would otherwise be required to pay over to the director of motor vehicles. (Italics ours.) RCW 35.58.277. Further, "[d]istribution of the special excise taxes paid into the general fund on *behalf* of any municipality shall be made to such municipality as provided in RCW 82.44.150. . . ." (Italics ours.) RCW 35.58.278. Note that the legislature directed distribution as provided in RCW 82.44.150. That statute is the ultimate expression of legislative intent which convinces us that these are not state funds, for it mandates that this tax "*shall be remitted to the municipality levying such tax*." (Italics ours.)

Respondent argues that by making biennial appropriations in 1971 and 1973 (Laws of 1971, 1st Ex. Sess., ch. 275, § 25, p. 1279, at 1280; Laws of 1973, 1st Ex. Sess., ch. 136, § 11(1), p. 908) of funds to be distributed to the municipalities, pursuant to RCW 82.44.150, the legislature evidenced an intent that the funds were subject to appropriation. Standing alone this fact is persuasive but is neither controlling nor conclusive in view of the detailed, explicit characterization of the funds as discussed above. *State ex rel. Shuff v. Clausen*, 131 Wash. 119, 229 P. 5 (1924). There is no legislative history of intent and purpose. We might speculate that the legislature wanted to avoid the very confrontation at issue which arose by its failure to make an appropriation in 1975. Had the legislature not appropriated funds in prior biennia, we suspect that respondent Treasurer would have sought the same judicial determination now before us.

Respondent also contends that these funds cannot be special proprietary funds because they are paid into the general fund. RCW 35.58.278. Before enactment of Laws of 1974, 1st Ex. Sess., ch. 54, they were paid into the motor vehicle excise fund. However, absent some other controlling constitutional or legislative direction, it is the character of the funds themselves, not the place of physical deposit which is determinative. *State ex rel. State Employees' Retirement Bd. v. Yelle, supra*; *State ex rel. Washington Toll Bridge Authority v. Yelle*, 195 Wash. 636, 82 P.2d 120 (1938).

We conclude that the statutory sections in issue do not contemplate the payment of the funds into the state treasury as state funds, rather, the funds should be considered local funds to be held by the State Treasurer in a custodial capacity; hence, no appropriation is required under article 8, section 4, as amended by amendment 11.

Since we hold that under the present statutory scheme these funds must be remitted to the qualifying municipalities, which holding is dispositive, we ordinarily would not reach the petitioners' contention that the title of chapter 2,

Laws of 1975, second extraordinary session, violates article 2, section 19 of our constitution. That section provides that "No bill shall embrace more than one subject, and that shall be expressed in the title." The object of this constitutional provision is well set out in *State ex rel. Washington Toll Bridge Authority v. Yelle*, 32 Wn.2d 13, 24, 200 P.2d 467 (1948):

> The purposes of this constitutional mandate are three-fold: (1) to protect and enlighten the members of the legislature against provisions in bills of which the titles give no intimation; (2) to apprise the people, through such publication of legislative proceedings as is usually made, concerning the subjects of legislation that are being considered; and (3) to prevent hodge-podge or log-rolling legislation. We have declared that when laws are enacted in violation of this constitutional mandate, the courts will not hesitate to declare them void.

The title to the 1975 act declares it to be:

> AN ACT Relating to appropriations; amending section 193, chapter 269, Laws of 1975 1st ex. sess. (uncodified); making appropriations; and declaring an emergency.

Section 1 of the act appropriates $65 million for special levy relief to school districts from the general fund, including revenues in the general fund collected from the motor vehicle excise tax imposed pursuant to RCW 35.58.273 through 35.58.279. Section 2 of the act appropriates $4,180,000 from the general fund to secure any general obligation bonds or revenue bonds issued by a municipality pursuant to RCW 35.58.279.

It is petitioners' contention that the title of the act in no manner indicates that the act will radically alter the system of financing public mass transit by preventing the municipalities from receiving the proceeds of locally levied motor vehicle excise taxes. Respondent contends that a holding for petitioners requires the court to invalidate that special levy relief appropriation in its entirety. Such is not the case and we deem it necessary to dispel the spectre of uncertainty raised by respondent's position.

■ ■ Assuming, arguendo, that the title does offend

article 2, section 19, the entire act is not necessarily void. The controlling rule is set out in *State ex rel. Distilled Spirits Institute, Inc. v. Kinnear*, 80 Wn.2d 175, 176-77, 492 P.2d 1012 (1972):

> The rule is that, if a portion of a statute is found to be invalid, the entire statute will not be struck down unless the invalid portion is unseverable and it cannot be reasonably believed that the legislature would have passed the one without the other, or unless the elimination of the invalid part would render the remainder of the act incapable of accomplishing the legislative purpose.

The purpose of the 1975 act was to provide a measure of special levy relief to school districts. It was an appropriation from the general fund, only a portion of which came from the motor vehicle excise tax. We cannot find that the legislature would not have made the same appropriation even if this limited resource was not available to them.[6] Elimination of the invalid portion of the act would still leave the remainder of the act capable of accomplishing the legislative purpose of providing special levy relief to school districts.

We need not reach petitioners' theory that the 1975 act amends existing law in contravention of Const. art. 2, § 37.

Finally, we address the impairment of contract question posed by the holders of Metro bonds. By a stipulated agreed statement of facts, the following facts are controlling. Metro in 1973 issued general obligation bonds in the amount of $14.9 million. Shortly thereafter those bonds were refunded with general obligation refunding bonds, bearing interest at a substantially lower interest rate. These bonds represent the local funding required to begin a capital acquisition and improvement program for the tran-

---

[6] Evidence of an intent by the legislature to appropriate $65 million to schools regardless of the existence of the local motor vehicle excise tax proceeds is found in Substituted House Bill No. 866, § 150, the prior school appropriation bill, which appropriated $65 million to schools from the general fund without any reference to motor vehicle excise taxes. This appropriation passed both the Senate and the House, however was vetoed by the Governor.

sit system, which Metro began operating in January 1973. This capital acquisition and improvement program is the foundation of the "comprehensive plan" adopted by the voters of Metro to consolidate and improve public transportation throughout Seattle and King County.

Metro's bonds were sold on the basis of representations contained in an Official Statement offering the bonds. The bondholders relied on that Official Statement in negotiations leading to the sale of the bonds. In the Official Statement, Metro pledged that it would levy the 1 percent motor vehicle excise tax and the 0.3 percent retail sales tax[7] as authorized by the legislature. The bonds had a last maturity date of June 1, 1981, which coincides with the termination of Metro's authority to levy the motor vehicle excise tax.

Revenues from the two sources substantially exceed the requirements for debt service on the bonds. This excess coverage was an important reason for a favorable rating received from municipal bond rating services. The excess coverage was also an important factor in the decision of the bondholders to purchase the bonds. The bonds could not have been sold at the same price and interest rate if the coverage had been significantly less than represented.

The 1969 act contemplated the issuance of bonds based upon a pledge of the motor vehicle excise tax. Further, it provided that so long as such pledge was in effect "[T]he *legislature shall not withdraw from the municipality the authority to levy and collect the tax.*" (Italics ours.) RCW 35.58.279.

The respondent concedes that the legislature is bound to not withdraw the taxing authority or divert the proceeds to some other purpose. However, he contends that failure to appropriate those proceeds does not prevent them from continuing to serve as security for the bonds. The security for the bonds is unimpaired, respondent argues, because the state will remain indebted to Metro for the amounts

---

[7]The 0.3 percent retail sales tax is authorized by RCW 82.14.045, and is used by Metro as part of its qualifying matching fund to receive the proceeds of the motor vehicle excise tax.

collected for Metro under the motor vehicle excise tax. Thus, he concludes, Metro has an account receivable subject to future legislative appropriation.

The answer to respondent's argument is simple. This is not what was promised to the bondholders. Metro pledged to levy and collect the motor vehicle excise tax until all the outstanding bonds had been retired. These anticipated tax revenues would exceed the debt service requirements on the bonds, thereby allowing Metro to carry out its proposed capital improvement program without suffering operating deficits. These matters were important factors in establishing the bond ratings, favorable sales terms and indeed the purchase by the bondholders. It is stipulated that a failure to remit the full 1 percent local motor vehicle excise tax will place Metro in operating financial difficulty and prevent Metro from completing its comprehensive plan.

In short, respondent asks the bondholders to accept an account receivable and an assumption that the state will appropriate funds to cover debt service in lieu of a financially sound operating transit system with the ability to complete its comprehensive plan.

The agreed statement of facts incorporates various exhibits, including affidavits from three municipal bond experts. These affidavits contain statements such as these: "The legislature, by withdrawing the 1 percent motor vehicle excise tax from Metro, has in effect substantially altered the security of the Metro transit bonds." "The reduction in the security of Metro transit bonds will unquestionably result in a reduction of the value of the bonds." "[A]ssuming that Metro receives only so much of the 1 percent motor vehicle excise tax as the legislature appropriates each year, and cannot continue with its planned capital improvement program, the value of the bonds would be significantly diminished." The experts conclude that the bonds will be reduced in value from $30 to $60 per thousand dollars par value, a significant reduction as to a $14.9 million issue. One expert concluded that if the bond rating services reduce the favorable ratings (A and AA) established at the

time of issuance, there will be an even greater loss of value. We emphasize that these are stipulated facts. There is nothing in the record to substantiate that respondent's ."accounts receivable" theory would lead to any opposite opinion.

■■ These undisputed facts bring the attempted legislative diversion of these funds within Const. art. 1, § 23: "No . . . law impairing the obligations of contracts shall ever be passed." We recently had an opportunity to consider the constitutionality of an attempted retraction of the authority of an issuer of bonds to levy a pledged excise tax in *Ruano v. Spellman*, 81 Wn.2d 820, 505 P.2d 447 (1973). In *Ruano* we held that an action, though indirect, which diminishes the value of the contract constitutes a prohibited impairment. It is stipulated that the bonds will be diminished in value from $30 to $60 per thousand dollars par value. As stated in *Ruano v. Spellman*, *supra* at 828, quoting from *Planters' Bank v. Sharp*, 47 U.S. (6 How.) 317, 344, 12 L. Ed. 447 (1848):

> One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not, by the Constitution, to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation, dispensing with any part of its force.

That principle governs this case. Inasmuch as it is stipulated that the value of the bonds will be diminished by a failure of the State Treasurer to remit the proceeds of the local motor vehicle excise tax, the failure to remit the proceeds of that tax constitutes an unconstitutional impairment of the contract between Metro and its bondholders.

A writ of mandamus shall issue requiring the respondent State Treasurer to remit to the qualifying, appropriate municipalities the funds to which they are entitled under existing statutes as held in this opinion.

STAFFORD, C.J., FINLEY, HAMILTON, and UTTER, JJ., and HENRY, J. Pro Tem., concur.

WRIGHT, J. (concurring)—I concur with the result

reached by the majority. I do so on the basis of Const. art 1, § 23 which reads in part: "No . . . law impairing the obligations of contracts shall ever be passed." U.S. Const. art. 1, § 10 contains a similar limitation upon the legislative power of the several states: "No state shall . . . pass any . . . law impairing the obligation of contracts . . . ." I agree with the majority with respect to the impairment of the obligation of contract.

As to the need for an appropriation before paying money out of the state treasury, I find it my duty to respectfully disagree with the majority. The language of Const. art. 8, § 4 (amendment 11) is plain, unambiguous and direct. It reads:

> *No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management*, except in pursuance of an appropriation by law; nor unless such payment be made within one calendar month after the end of the next ensuing fiscal biennium, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum.

(Italics mine.)

When the language of a constitutional provision is plain on its face, no construction is necessary or permissible. *State ex rel. Evans v. Brotherhood of Friends*, 41 Wn.2d 133, 247 P.2d 787 (1952); *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 452 P.2d 943 (1969); *State ex rel. Swan v. Jones*, 47 Wn.2d 718; 289 P.2d 982 (1955); *United States v. Sprague*, 282 U.S. 716, 75 L. Ed. 640, 51 S. Ct. 220, 71 A.L.R. 1381 (1931).

In this connection, it is also well to keep in mind Const. art 1, § 29, which reads: "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise."

In this connection even the majority concedes: "Arguably the literal language of the constitution would require a

legislative appropriation to disburse any funds from the state treasury under the express words of that article."

The constitutional provision being plain, it is likewise plain that an appropriation is required to disburse money from the state treasury, "or any of its funds, or any of the funds under its management." Any cases to the contrary are directly contrary to the constitution and should be forthwith overruled.

I would grant the writ, but only on the basis of the constitutional prohibition against impairment of the obligation of contracts.

ROSELLINI, J. (dissenting in part)—I cannot agree with the majority that the taxes levied and collected by the municipalities and paid into the state treasury, pursuant to statute, constitute a special "proprietary" fund not subject to the power of appropriation. The municipalities are creatures of the legislature, and their power to levy this tax was derived therefrom. The power of the legislature over political subdivisions is plenary unless restrained by provisions of the constitution. *State ex rel. Barlow v. Kinnear*, 70 Wn.2d 482, 423 P.2d 937 (1967). Thus the legislature, which conferred the power to levy, collect and use this tax, may take away that power so long as constitutional provisions are not violated.

The taxes collected are not private funds, as were the retirement payments held in trust by the State in the case of *State ex rel. State Employees' Retirement Bd. v. Yelle*, 31 Wn.2d 87, 195 P.2d 646 (1948), relied upon by the majority. These taxes are public property, and they are moneys in the state treasury, and therefore subject to the provisions of Const. art. 8, § 4 (amendment 11). That provision is not limited in its terms to moneys belonging to the state, as the majority assumes, but rather embraces all money in the treasury. The "special fund" doctrine has carved an exception when private parties claim ownership of funds in the treasury, but I can conceive no sound reason to expand the doctrine to include moneys belonging to or claimed by subdivisions of the State. Such an extension may soon lead to

judicial control of the public funds. It was the manifest intent of the framers of the constitution that the *legislature* should control the treasury.

In the case of *State ex rel. Toll Bridge Authority v. Yelle*, 61 Wn.2d 28, 377 P.2d 466 (1962), the legislature had created a special fund, into which the proceeds of an excise tax on motor vehicle fuels were to be paid. These funds were to be used for the payment and servicing of bonds issued to finance the building of a toll bridge. The legislative act in that case served a purpose very similar to that which was served in this case by the legislation which was designed to facilitate the acquisition and operation of public transportation systems. It was there contended that the act in question violated article 8, section 4 (amendment 11) because it obligated the State beyond the biennium and thus constituted an appropriation extending beyond the time provided in the constitution.

This court held that the statute in question did not appropriate moneys beyond the biennium but rather dedicated the fund to a specific use, the payment of its contractual obligation to those who should purchase bonds. It was agreed by counsel that each succeeding legislature would be required to enact the necessary appropriation measure, if the bonds were to be serviced.

If the legislation in that case was subject to the provisions of article 8, section 4 (amendment 11), the statutes under consideration in this case are also subject to those provisions. There is no material difference between them. While the municipalities levy and collect the taxes, this is done pursuant to and subject to legislative authority and the funds are dedicated to the municipal purpose by the legislature, which expressly provided that they should be paid into the state treasury. Once there, they were subject to the requirements of article 8, section 4 (amendment 11).

We are not here called upon to decide whether, in failing to appropriate the funds which it had previously dedicated, the legislature breached a contractual commitment to the bondholders, and I will voice no opinion upon that subject.

The contentions in this case are that no appropriation was necessary (a contention which the authorities fall short of supporting) and that the legislature could not, or did not, appropriate the funds in question for another purpose.

Upon the question whether the legislature validly appropriated the funds in question for other uses, I am in agreement with the contention of the petitioners that the appropriations act, to the extent that it altered the use to which the fund was dedicated in RCW 35.58.279, was in violation of Const. art. 2, § 37, which provides:

> No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length.

*State ex rel. Toll Bridge Authority v. Yelle*, 54 Wn.2d 545, 342 P.2d 588 (1959); *State ex rel. Trenholm v. Yelle*, 174 Wash. 547, 25 P.2d 569 (1933). To that extent the act was of no effect.

If the attempted appropriation was invalid under article 2, section 37, it is unnecessary to consider whether it also violated the contracts clauses of the state and federal constitutions, insofar as rights of existing bondholders are involved. However, since the majority opinion deals with this question and since I am not in agreement with all that is said with respect to it, I believe it will not be inappropriate to set forth briefly my views upon that subject.

I agree with the majority that, insofar as Laws of 1975, 2d Ex. Sess., chs. 2 and 7, appropriated to another use funds of a municipality which had sold bonds to purchasers who relied upon the statutory dedication of the tax proceeds, it impaired the security and therefore the obligation of the contracts entered into between the municipality and the bondholders. The statutory provisions whereby these taxes were to be levied, collected, held and used for the payment of the bond obligations as well as the operation of the transportation systems, was a vital part of the contract and one which the legislature could not constitutionally abrogate by diverting the funds to another purpose. While it is true that the legislature appropriated an amount sufficient

to service the bonds, to be used for that purpose, it had no right to appropriate any of these funds for other purposes, so long as bonds were outstanding and unpaid. *Von Hoffman v. Quincy*, 71 U.S. (4 Wall.) 535, 18 L. Ed. 403 (1866).

I am not willing to join the majority in its implication that every act of the legislature which indirectly, as well as directly, affects the value of a contract, violates the contract's clause. There may be many kinds of legislation which incidentally affect the value of private contracts but which are enacted for a legitimate public purpose within the police power and are not invalid, because of their effect upon contracts. Examples which immediately come to mind are zoning laws and laws enacted for the protection of the environment.

Also, I do not subscribe to the notion, conceivably implied in *Ruano v. Spellman*, 81 Wn.2d 820, 505 P.2d 447 (1973), and the majority opinion in this case, that a governmental body may not call in its bonds and pay them off according to their terms and thereafter abandon the project for the financing of which they were issued. As the United States Supreme Court indicated in the *Quincy* case, the State's obligation continues only so long as there are bonds outstanding. That question is not before the court in this case, of course, since none of the municipalities seeks to abandon its public transportation system; but I think the court should make it clear that it does not intend to foreclose the question.

A conclusion that the legislature's attempt to appropriate the funds in question to another purpose was unconstitutional does not answer the question: Can the legislature be compelled to appropriate them to the purpose to which they were dedicated? If there is authority for the proposition that the court can order the legislature to appropriate money, the petitioners have not cited it, and I should be very much surprised if such authority can be found. The petitioners, I must conclude, however reluctantly, have failed to sustain their burden of showing that the court should order the funds to be paid over to the municipalities.

In my opinion, the petitioners are entitled to an order restraining the State Treasurer from paying any of the funds deposited in the treasury by the municipalities, pursuant to the statutes authorizing them to levy and collect motor vehicle excise taxes, to any party other than these municipalities. They are not entitled to a writ requiring the payment to them of these funds, no appropriation having been made.

HUNTER, J., concurs with ROSELLINI, J.