[No. 59870-3.    En Banc.    June 16, 1994.]

ALEX TYRPAK, ET AL, *Respondents*, v. DAVID H. DANIELS, ET AL, *Appellants*.

*Robert A. Lewis* (of *Knapp, O'Dell & Lewis*), for appellants.

*Schwabe, Williamson & Wyatt*, by *Charles E. Gallup* and *Alicia L. Lowe*, for respondents.

DURHAM, J. — The Port of Camas-Washougal and its commissioners, along with others (hereinafter referred to collec-

tively as the Port of Camas-Washougal), appeal directly to this court from a superior court decision which held that RCW 53.04.082 is an unconstitutional impairment of contract. This statute permits a less than county-wide port district to annex adjacent territory in another less than county-wide port district if the territory in question is within the limits of a city which forms part of the name of the annexing port district. Respondents the Port of Vancouver, U.S.A., certain individual bondholders and a resident of the port district (hereinafter referred to collectively as the Port of Vancouver) additionally seek review of the trial court's holding that the statute does not constitute unconstitutional special legislation. We agree with the trial court that this statute effected an unconstitutional impairment of the bond contracts in question, affirm the trial court on that basis, and so do not reach the second issue raised.

Both the Port of Camas-Washougal and the Port of Vancouver are less than county-wide port districts, are located in Clark County, and share a common boundary. The Port of Vancouver includes all of the city of Vancouver, as well as unincorporated areas surrounding that city. The Port of Camas-Washougal originally included all of the area encompassing the cities of Camas and Washougal, as well as unincorporated areas.

In 1992, the Port of Vancouver had $7.39 million in outstanding general obligation bonds. The amount required for debt service on those bonds in 1992 was $1.6 million. The most recent bond issue by the Port of Vancouver was in 1986, and the Port has the authority to issue $10 million in additional general obligation bonds without seeking taxpayer approval. The Port of Vancouver's bonds require it to each year levy an amount sufficient to pay the principal and accrued interest then due and owing. The Port of Vancouver presently takes in approximately $900,000 more per year in taxes than it needs to meet these bond obligations. Both the Port of Vancouver and the Port of Camas-Washougal currently levy the maximum tax they are permitted to levy against taxable property within their boundaries.

Within the last decade, the City of Camas has annexed unincorporated areas which lie within the boundary of the Port of Vancouver. The total area affected consists of about 600 acres with an assessed value in 1991 of $8,492,527, generating approximately $3,800 in taxes for the benefit of the Port of Vancouver. Approximately 20 to 25 registered voters reside in this area.

Due to these annexations, the Port of Camas-Washougal has been attempting for some time to change the boundaries between the two port districts such that it could expand to encompass the newly enlarged boundaries of the city of Camas. To some extent, the Port of Vancouver accommodated these efforts, going so far as meeting with a commissioner of the Port of Camas-Washougal to discuss possible solutions to the boundary dispute. However, after further discussions and investigation, the Port of Vancouver decided that such a move would be too complicated and not in its best interest, and did not further pursue any boundary change proposals. Nonetheless, the Port of Camas-Washougal was still anxious to annex, and having failed to convince its neighbor of the wisdom of such a move, turned to the Legislature for help.

In 1992, a small number of legislators introduced bills or amendments specifically designed to enable the Port of Camas-Washougal to annex territory within the Port of Vancouver without that port's approval. As described by one of the supporters of these bills, the underlying goal of the legislation was to increase the tax assessment of the Port of Camas-Washougal at the expense of the Port of Vancouver. Ultimately, the Legislature adopted RCW 53.04.082. That statute reads:

> A port district that is less than county-wide may annex adjacently located territory that is located in another less than county-wide port district in the same county, if the territory proposed to be annexed is located in a city the name of which is included as part of the name of the annexing port district. A port district proposing to annex territory under this section shall by resolution cause a ballot proposition on the issue of annexation to be submitted to the voters of the area proposed to be annexed. The annexation is authorized when the ballot

proposition is approved of by over fifty percent of the ballots cast. The territory that is annexed shall be removed from the other port district.

This section shall expire January 1, 1995.

RCW 53.04.082. The statute became effective on June 11, 1992. Laws of 1992, ch. 147, § 3. On June 22, 1992, the Board of Port Commissioners of the Port of Camas-Washougal adopted a resolution requesting that the county auditor put the question of annexation of the Port of Vancouver territory lying within the expanded limits of the city of Camas on the November 1992 ballot.

In response to this request, the Port of Vancouver brought suit to enjoin the Port of Camas-Washougal from placing this annexation proposal on the ballot. The Port of Vancouver argued that RCW 53.04.082 is unconstitutional because it (1) impairs a contractual obligation, (2) constitutes special legislation, and (3) has a legislative title which does not generally express the subject of the statute.

In September 1992, the trial court heard testimony and argument from the parties. The trial court found that the Port of Vancouver's general obligation bonds were secured by the pledge of the Port's full faith and credit of the entire port district at the time of the issuance of the bonds, and that:

> Removal of part of the PORT OF VANCOUVER's district reduces the taxable property pledged to pay the outstanding bonds, and decreases the ability of the PORT OF VANCOUVER to pay its G.O. bond obligations.

Clerk's Papers, at 71. The court found that the reduction or threat of reduction in the assessed valuation adversely affected the credit rating and value of the outstanding bonds as well as future issues. The court also found that:

> Although the present proposed annexation is small in terms of annual revenue, it is substantial over the term of the bonds. The potential for future annexation outside of the control of the PORT OF VANCOUVER also has a substantial effect on the existing bonds.

Clerk's Papers, at 71. The trial court noted that the statute failed to address the ongoing tax obligations of the taxpayers in the subject area to the Port of Vancouver.

The court specifically held that the annexation would adversely affect the bonds and that:

> The value of outstanding G.O. bonds is reduced due to 1) the removal of part of the PORT OF VANCOUVER's assessed territory by the proposed annexation, and 2) the uncertainty of further annexation in the future.

Clerk's Papers, at 75. The court also noted that RCW 53.04.082 left the Port of Vancouver and its bondholders with no ability to control reductions in the port's territory due to annexations. Having found a substantial impairment, and having found no evidence that public policy or the State's police power necessitated the impairment, the court concluded that RCW 53.04.082 is unconstitutional because it impairs the contractual bond obligations. However, it also held that RCW 53.04.082 did not constitute special legislation and that its title did generally express the subject of the statute.

The Port of Camas-Washougal appealed the trial court's finding as to the impairment of contracts issue. The Port of Vancouver cross-appealed the special legislation issue. This court accepted direct review.

Article 1, section 10 of the United States Constitution declares that "No state shall . . . pass any . . . law impairing the obligation of contracts . . .". Similarly, article 1, section 23 of the Washington State Constitution states that "No . . . law impairing the obligation of contracts shall ever be passed." We have previously interpreted these provisions to be coextensive, and there is no argument raised by either party that they should not be given the same effect. *See Ruano v. Spellman*, 81 Wn.2d 820, 825, 505 P.2d 447 (1973). The prohibition against any impairment of contracts "is not an absolute one and is not to be read with literal exactness". *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428, 78 L. Ed. 413, 54 S. Ct. 231, 88 A.L.R. 1481 (1934). But when a state interferes with its own contracts, those impairments "face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties". *Allied Structural*

*Steel Co. v. Spannaus,* 438 U.S. 234, 244 n.15, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1978). *Accord Caritas Servs., Inc. v. Department of Social & Health Servs.*, 123 Wn.2d 391, 402-03, 869 P.2d 28 (1994). The Port of Vancouver is a municipal corporation and, therefore, its contracts qualify as public contracts. *See Continental Ill. Nat'l Bank & Trust Co. v. Washington,* 696 F.2d 692, 699-700 (9th Cir. 1983).

This court uses a 3-part test to determine if there has been an impairment of a public contract: (1) does a contractual relationship exist, (2) does the legislation substantially impair the contractual relationship, and (3) if there is a substantial impairment, is it reasonable and necessary to serve a legitimate public purpose. *Caritas,* at 403; *Carlstrom v. State,* 103 Wn.2d 391, 694 P.2d 1 (1985). Both parties agree that the outstanding bonds of the Port of Vancouver constitute a contract between the Port and the bondholders. We turn then to the issue of impairment.

The contracts formed between the Port of Vancouver and its bondholders are made up of the terms of the bonds, their authorizing resolutions, and the statutes governing port districts and bond issues. The general obligation bonds here constitute a promise by the Port of Vancouver to pay the registered holder the principal and interest due and owing on a semiannual basis until the earlier of either the maturity date or the date of redemption. Through the bonds, the Port of Vancouver:

> irrevocably covenants and agrees with the owner of this bond that it will include in its annual budget and levy taxes annually within and as a part of the tax levy permitted to port districts without a vote of the electorate, in amounts sufficient, together with all other moneys legally available therefor, to pay the principal of and interest on this bond as the same shall become due. The full faith, credit and resources of the Port are hereby irrevocably pledged for the annual levy and collection of such taxes and the prompt payment of such principal and interest.

Br. of Resp'ts app. The "ADDITIONAL BOND PROVISIONS" on the back of the bond also note that the pledge of tax levies may be discharged prior to maturity so long as alter-

nate provisions for payment are made according to the terms and conditions of the bond resolution.

Much of the testimony and argument in this case centered on the negative effect of the statute on the "value" of the bonds. There is support in Washington case law for the proposition that *any* diminution in the value of the contract due to government action constitutes an impairment. *Ruano*, at 828; *Metropolitan Seattle v. O'Brien*, 86 Wn.2d 339, 352, 544 P.2d 729 (1976). Nonetheless, in the context of bonds, we have also recognized that a strict "value" test for impairment may sweep too broadly. In *Haberman v. WPPSS*, 109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987), this court disavowed a literal reading of its previous "value" language:

> In *O'Brien*, the Legislature authorized certain taxes to provide security for a city's debt service obligations pursuant to the city's issuance of bonds. *O'Brien*, at 342. This security, which substantially exceeded the actual debt requirements, was found to be an important reason for favorable bond ratings and an important factor in the bondholders' decisions to purchase the bonds. *O'Brien*, at 351. It was within this context that the court held that a state official's withholding of the funds impaired the bondholders' contract because his actions diminished the value of the bonds by affecting the security underlying them. *O'Brien*, at 352.

*Haberman*, at 146.

Hence, for purposes of impairment, it is not dispositive that the statute creates the potential for value fluctuation, since a change in value is an inherent risk in buying any marketable security. As the testimony in this case indicated, the market value of the bonds, as well as their rating, could be affected by a number of factors, both governmental and private. Similarly, the value of the assessments supporting the bonds may fluctuate from year to year. The bond contract does not guarantee bondholders that the Port will sustain any particular bond rating or market value. A mere change in the value or rating of the outstanding bonds, by itself, is not enough to prove an impairment of contract.

Rather, the relevant question is whether the legislation detrimentally affects the financial framework which

induced the bondholders originally to purchase the bonds, without providing alternative or additional security. *See Haberman*, at 146-47; *Continental Ill. Nat'l Bank*, 696 F.2d at 701. Prior to the passage of RCW 53.04.082, the Port of Vancouver's boundaries were fixed, and could only be altered with the approval of the Port's commissioners, who presumably would look out for the best interests of the Port and its bondholders. *See* RCW 53.04.120. The mere existence of this statute adds a "new and unpredictable element" to the very contours of the municipal corporation with which the bondholders contracted. *See Continental Ill. Nat'l Bank*, 696 F.2d at 700. This statute allows one port district to take land area from another port district without the latter's consent, effectively reducing its available tax base.

> Once having granted certain powers to a municipal corporation, which in turn enters into binding contracts with third parties who have relied on the existence of those powers, the legislature . . . is not free to alter the corporation's ability to perform.

*Continental Ill. Nat'l Bank*, 696 F.2d at 700. This situation is analogous to a mortgagee discovering, after the mortgage has been executed, that the government has permitted portions of the mortgagor's property to be unilaterally seized by a neighbor, without paying compensation and without protecting the mortgagee's interest. Such a change would undoubtedly "take[ ] from the mortgage the quality of an acceptable investment for a rational investor." *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 60, 79 L. Ed. 1298, 55 S. Ct. 555, 97 A.L.R. 905 (1935).

It cannot be disputed that removal of the land area proposed for annexation will reduce the amount of taxes collectible by the Port of Vancouver. It is also true that the principal method for repaying the bond obligations is the collection of such taxes. *See generally* Roy J. Koegen, *Washington Municipal Financing Deskbook* § 2:9.1.1 (1993) (noting that promise to pay general obligation bonds is unconditional and that source of such repayment is ad valorem taxes). Although this proposed annexation will not

cause the Port of Vancouver's tax base to fall below the minimum necessary for repayment, the excess taxes collected by the Port of Vancouver, over and above those necessary to meet their bond obligations, form additional security against routine economic fluctuations, making the bonds more financially attractive.

> Absent the payment of just compensation, the repeal of a particular security provision impair[s] an obligation of contract even though the bondholders might have retained other contractual security.

*Continental Ill. Nat'l Bank & Trust Co. v. Washington*, 696 F.2d 692, 700 (9th Cir. 1983).

More importantly, the change in boundaries and concomitant reduction of the tax base authorized by the statute occur without the approval, and in this case with the express disapproval, of the Port of Vancouver. RCW 53.04.082 permits the Port of Camas-Washougal, in conjunction with the ratification of a minority of the voters in the Port of Vancouver, to unilaterally diminish the security relied upon by the bondholders. The bondholders bought the bonds with the presumption that the Port of Vancouver would continue to exist in the form that was described at the time of the bond issue, or that if a change were made, their security would be protected.[1] The putatively minimal impairment of the tax base permitted by RCW 53.04.082 is greatly amplified by the Legislature's decision to override the inherent power of the port commissioners to protect the best interests of the Port and its bondholders. It is clear that this annexation, if approved, would cause a substantial impairment of the bond contracts.

---

[1] We note, however, that "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n.16, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977). Moreover, a contract with the government does not impose upon it a binding obligation to maintain with photographic precision the status quo at the time of the contract. What it does require is that policy changes and political evolutions not discard the legitimate expectations embodied in the contract, nor dramatically diminish the inducements which led to the initial formation of the contract. A statute similar to RCW 53.04.082 containing explicit provisions for protecting the bondholders' expectations regarding the port's taxable area would present a very different case.

Having found an impairment, the next question is whether the challenged legislation is "nevertheless justified as a reasonable and necessary exercise of the State's sovereign power." *Continental*, 696 F.2d at 697. This prong of the impairment test calls for two broad and interrelated inquiries: (1) can a legitimate public purpose for the legislation be identified and, if so, (2) is the legislation reasonable and necessary to achieve that public purpose. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412-13, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983). This third prong of the test strikes a balance between the inherent police power of the state and the legitimate expectations of those who enter into contracts with the state. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23-24, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977).

> For example, a revenue bond might be secured by the State's promise to continue operating the facility in question; yet such a promise surely could not validly be construed to bind the State never to close the facility for health or safety reasons.

*United States Trust Co.*, 431 U.S. at 25. But to exempt a contract from constitutional protection demands significant justification. *Ruano v. Spellman*, 81 Wn.2d 820, 830, 505 P.2d 447 (1973) (Utter, J., concurring). Hence, "even minimal impairment of contractual expectations violates the contract clause where there is no real exercise of police power to justify the impairment." *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1, 9, 776 P.2d 721 (1989).

"The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group*, 459 U.S. at 412. What is particularly striking in this case is the *absence* of any reasonable police power justification for RCW 53.04.082. The record here shows that this statute was proposed specifically to deal with the annexation of Port of Vancouver territory by the City of Camas. Respondents make a cogent argument that the statute's language limiting annexations to territory "located in a city the name of which is included *as part of* the name of the annex-

ing port district" was intended to limit the statute's application solely to the Port of Camas-Washougal, which is the only port in the state containing the name of two cities. RCW 53.04.082. (Italics ours.) The experts at trial were unaware of any other annexation statute which did not explicitly provide for the security of the bondholders. It is especially difficult to sustain the argument that RCW 53.04.082 is a reasonable and necessary exercise of the State's power to prescribe boundaries, since there is already a provision in the law permitting interdistrict annexations if done with the unanimous consent of the commissioners of *both* districts. RCW 53.04.120. Coupled with its limited life span, this law can hardly be described as a law governing ports generally or one protecting a broad societal interest rather than one seeking to accommodate a uniquely parochial desire. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 248-49, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1978).

Given the weak justification for the statute, and balancing that against its consequences to the bondholder's expectations, we agree with the trial court that the annexation permitted by RCW 53.04.082 will effect an unconstitutional impairment of the Port of Vancouver's contracts with its bondholders. Since we hold RCW 53.04.082 unconstitutional as a violation of both the state and federal constitutions, we need not address the special legislation argument raised by Respondents. The judgment of the trial court is affirmed.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.