[No. 73607-3. En Banc.]
Argued June 26, 2003. Decided October 30, 2003.

PIERCE COUNTY, ET AL., *Respondents*, v. THE STATE OF WASHINGTON, ET AL., *Appellants*.

424

Robert C. Rowley and James J. Klauser (of Rowley & Klauser) and Christine O. Gregoire, Attorney General, James K. Pharris and Linda M. Moran, Senior Assistants, and Jerald R. Anderson, Senior Counsel, for appellants.

Clifford Freed (of Frank Freed Subit & Thomas, L.L.P.); Thomas F. Ahearne, Hugh D. Spitzer, and Alice M. Ostdiek (of Foster Pepper & Shefelman, P.L.L.C.); Paul J. Lawrence (of Preston Gates & Ellis, L.L.P.); Desmond L. Brown; and Norm Maleng, Prosecuting Attorney for King County, and Thomas W. Kuffel and Noel R. Treat, Deputies, for respondents.

[As amended by order of the Supreme Court March 9, 2004].

OWENS, J. — In November 2002, voters passed another $30 license tab initiative, Initiative Measure 776 (I-776).[1] In February 2003, the King County Superior Court declared I-776 unconstitutional on the grounds that it embraced more than a single subject and substantially impaired King County's contractual obligations to its bondholders. This court accepted direct review. Because we conclude that I-776 did not violate the Washington State Constitution, we reverse the superior court's grant of summary judgment and remand for proceedings consistent with this decision.

---

[1] Regarding the prior license tab initiative, see Amalgamated Transit Union Local 587 v. State, 142 Wn.2d 183, 256, 11 P.3d 762, 27 P.3d 608 (2000) (holding that Initiative Measure 695 violated "several state constitutional provisions," among them the requirement that a bill embrace no more than one subject).

## FACTS

I-776 was filed with the secretary of state on January 7, 2002, as an initiative to the people. CONST. art. II, § 1(a). The sponsors entitled the initiative "AN ACT Relating to limiting government-imposed charges on motor vehicles." Clerk's Papers (CP) at 19. Pursuant to RCW 29.79.035(1) and (2) and 29.79.040, the attorney general's office prepared a ballot measure summary and the following ballot title for the initiative:

> Initiative Measure No. 776 concerns state and local government charges on motor vehicles. This measure would require license tab fees to be $30 per year for motor vehicles, including light trucks. Certain local-option vehicle excise taxes and fees used for roads and transit would be repealed.

> Should this measure be enacted into law?
> Yes [ ] No [ ]

CP at 18. On November 5, 2002, the voters approved the ballot measure by a majority vote. The measure was to take effect on December 5, 2002, 30 days after the election, as provided in article II, section 1(d) of the state constitution.

On November 27, 2002, Pierce County, the city of Tacoma, two Pierce County residents, and one King County resident filed a complaint in King County,[2] seeking declaratory and injunctive relief on the grounds that I-776 was unconstitutional. On December 2, 2002, King County joined the suit by amended complaint. Two days later, King County Superior Court Judge Mary Yu granted Pierce County's motion for a preliminary injunction, enjoining implementation of I-776 in King and Pierce Counties prior to a hearing on the merits. A summary judgment hearing on cross-motions for summary judgment was set for January 31, 2003.

On December 16, 2002, the superior court permitted intervention on Pierce County's side by the Central Puget

---

[2] The original plaintiffs (now respondents before this court) will be referred to herein as "Pierce County."

Sound Regional Transit Authority (Sound Transit) and eight other parties. Four days later, G. Dennis Vaughn and Salish Village Home Owners Association (Salish) moved to intervene and filed a complaint seeking a declaration that I-776 was constitutional and that Sound Transit was not a constitutionally formed entity. The superior court granted the motion to intervene on December 27 but restricted Salish's claims to the constitutionality of I-776. On January 23, 2003, the court granted Permanent Offense's January 14 motion to intervene as a defendant.

Oral argument on cross-motions for summary judgment was heard on January 31, 2003. On February 10, the superior court filed a memorandum decision and order, granting judgment in favor of Pierce County. The court concluded that Pierce County was entitled to summary judgment on two alternative grounds: (1) that I-776 violated article II, section 19 of the state constitution (the single-subject and subject-in-title requirement); and (2) that I-776 violated article I, section 23 of the state constitution because I-776's repeal of a $15 motor vehicle fee impaired King County's obligations to its bondholders.

The State and Salish sought direct review, which this court granted on an accelerated basis.

## ISSUES

(1) (Raised by the State and Salish) Did the superior court properly conclude that I-776 violated article II, section 19 of the state constitution, which provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title"?

(a) Did precatory language in I-776 (specifically, policy expressions regarding transit agencies that have levied motor vehicle excise taxes) introduce a second "subject," as that term is used in article II, section 19?

(b) If I-776 embraced but a single subject, did the ballot title express that subject?

(2) (Raised by the State and Salish) Did the superior court correctly determine that I-776 violated article I, section 23 of the state constitution, which provides that "[n]o . . . law impairing the obligations of contracts shall ever be passed"?

(3) (Raised by Pierce County) Did I-776 violate constitutional precepts of local home rule set forth in article XI, sections 4 and 12 of the state constitution?

(4) (Raised by Sound Transit) In repealing the motor vehicle excise tax [MVET], did I-776 exceed the scope of the initiative power prescribed in article II, section 1 of the state constitution or violate Sound Transit's due process rights, guaranteed in article I, section 3?

(5) (Raised by Salish) Is Salish entitled to attorney fees?

## ANALYSIS

■ ■ *Standard of Review.* The State and Salish seek reversal of the superior court's grant of summary judgment in favor of Pierce County. This court's review is de novo. *Wash. Fed'n of State Employees v. State*, 127 Wn.2d 544, 551, 901 P.2d 1028 (1995). Summary judgment is properly granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). As with the interpretation of a statute, the interpretation of an initiative is a question of law, subject to de novo review. *See Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 204-06, 11 P.3d 762, 27 P.3d 608 (2000); *Wash. Fed'n*, 127 Wn.2d at 556 (noting that the people's approval of an initiative is equivalent to the legislature's enactment of a statute).

■ *I-776's Satisfaction of Single-Subject and Subject-in-Title Requirements.* Article II, section 19 of the state constitution requires that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title." The oft-acknowledged purpose of the first clause, the single-subject provision, is to prevent "[l]ogrolling or hodgepodge legislation," the tactic of attaching an unpopular bill to a

popular one on an unrelated subject. *Wash. Fed'n*, 127 Wn.2d at 554; *Amalgamated*, 142 Wn.2d at 207; *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1331 (1993) (defining "logrolling" as "the trading of votes by legislators to secure favorable action on projects of interest to each one"). In *Power, Inc. v. Huntley*, 39 Wn.2d 191, 235 P.2d 173 (1951), this court identified "the clearest possible illustration of the kind of 'logrolling,' the 'you-scratch-my-back-and-I'll-scratch-yours' situation that the constitutional provision was designed to prevent"; in that case, "neither the appropriation bill . . . nor the corporation income tax bill, . . . standing on its own merits, could pass the legislature in the special session, but when the proponents of these measures combined their interests, both were enacted." *Id.* at 198-99. As to the second clause in article II, section 19, the subject-in-title requirement, the purpose is "to notify members of the Legislature and the public of the subject matter of the measure." *Amalgamated*, 142 Wn.2d at 207.

The two article II, section 19 requirements apply with equal force to enactments of the legislature and to initiatives, for "[i]n approving an initiative measure, the people of Washington wield direct legislative power." *In re Estate of Thompson*, 103 Wn.2d 292, 294, 692 P.2d 807 (1984); *see* CONST. art. II, § 1(a). A statute or initiative measure is presumptively constitutional; consequently, a party asserting that either violates the state constitution "bears the heavy burden of establishing its unconstitutionality beyond a reasonable doubt." *Amalgamated*, 142 Wn.2d at 205. A court interpreting an initiative measure must ascertain the voters' intent in approving the measure. *Id.* Where the language of the initiative is clear and unambiguous, a court may not look beyond the text of the measure; however, if the initiative is susceptible to more than one reasonable interpretation, a court may determine the voters' intent by applying canons of statutory construction or by "examin[ing] the statements in the voters pamphlet." *Id.* at 205-06.

## a. *The Single Subject of I-776*

■ The first step in the article II, section 19 analysis is to determine whether Pierce County has shown beyond a reasonable doubt that I-776 violates the single-subject requirement. An initiative embraces a single subject if its parts are rationally related to one another. *Kueckelhan v. Fed. Old Line Ins. Co.*, 69 Wn.2d 392, 404, 418 P.2d 443 (1966) (holding that "[t]he relationship between fire insurance regulation and rating, fire loss, fire prevention, and fire investigation is rational and reasonable"); *Fritz v. Gorton*, 83 Wn.2d 275, 290, 517 P.2d 911 (concluding that a half dozen subtopics, ranging from regulation of lobbyists to inspection of public records, were "reasonably related," thus satisfying "the nexus requirements of the 'rational unity' test"), *appeal dismissed*, 417 U.S. 902, 94 S. Ct. 2596, 41 L. Ed. 2d 208 (1974); *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 639, 71 P.3d 644 (2003) (determining that a ban on trapping animals with certain body-gripping traps was rationally related or "germane to" a ban on killing animals with certain pesticides).[3]

The State maintains that the sole subject of I-776 is the placement of a $30 ceiling on state and local government fees that citizens must pay to license their cars and light trucks. The State asserts that the 11 sections of I-776 are rationally related to that subject:

Section 1: "Policies and Purposes"

Section 2: "Requiring License Tab Fees to Not Exceed $30 Per Year for Motor Vehicles" (pertaining to cars, sport utility vehicles, motorcycles, and motor homes)

Section 3: "Requiring License Tab Fees to Not Exceed $30 Per Year for Light Trucks . . . " (amending fee schedule set forth in RCW 46.16.070)

[Sections 4-5: Actions of the 2002 legislature made these sections, pertaining to RCW 35.58.273, unnecessary.]

---

[3] Pierce County, the State, and Salish agreed below that the title was "general." *See* CP at 1724. The State questions "whether going through the exercise of labeling a title as 'broad' or 'restrictive' really assists the constitutional analysis," but we need not address that concern here. Appellant's Br. at 23. *See Citizens*, 149 Wn.2d at 632-36 (discussing "general" and "specific" titles and reaffirming that "the 'rational unity' analysis" applies to legislation bearing a "general" title).

Section 6: "Repealing the Local Motor Vehicle Excise Tax [MVET]" (repealing authority of certain transit agencies to impose MVET under RCW 81.104.160, the statute under which Sound Transit levied MVET and thereby increased car tab fees)

Section 7: "Legislative Intent Relating to Outstanding Bonds"

Section 8: "Repealing the Local Option Vehicle License Fee" (repealing local option vehicle license fee previously authorized by RCW 82.80.020, under which Pierce and King Counties levied vehicle license fees)

Section 9: "Construction Clause" (mandating liberal construction of act)

Section 10: "Severability Clause"

Section 11: "Legislative Intent"

CP at 370-73.

The superior court found that sections 2, 3, 4, 6, and 8 were "the operative and relevant sections" and that all were *"germane to* the single general subject of . . . limiting the amount of state and local government charges that motor vehicle owners must pay upon the registration or renewed registration of a vehicle." CP at 1728-29 (emphasis added). The superior court then considered whether sections 1 and 7 were "precatory or mandatory—that is whether they [were] policy expressions of no consequence or legally enforceable obligations."[4] Agreeing with the State and Sound Transit that sections 1 and 7 were "pure policy expressions," CP at 1733, the superior court acknowledged that this court "has not addressed the question of whether a precatory provision within an initiative can introduce a second subject." CP at 1734.

The superior court implicitly answered that legal question in the affirmative and went on to conclude that one

---

[4] CP at 1732. *See* WEBSTER'S, *supra*, at 1783 (defining "precatory words" as "words of recommendation, request, entreaty, wish, or expectation employed in legal instruments (as wills) and often resulting in no effective gift or rights being created"); BLACK'S LAW DICTIONARY 1195 (7th ed. 1999) (defining "precatory" as "requesting, recommending, or expressing a desire for action, but usu. in a nonbinding way").

sentence in section 1 (the 8th of its 11 sentences)[5] and all three sentences in section 7 (*see* Appendix B attached) "introduce a separate subject into the body of the Initiative," violating the single-subject rule. CP at 1735. The court observed that the eighth sentence in section 1 "calls for the re-submission of changes to transportation plans and programs to the voters,"[6] but the court acknowledged that, while the four sentences express the people's wish for "[a] re-vote on existing transit projects or a re-vote on future funding for transit," CP at 1736, section 1 refers to no statute or mechanism for putting such a wish into action, nor does anything in sections 1 or 7 legally bind Sound Transit "to repay bonds early or to conduct a revote on light rail." CP at 1733. In fact, as the superior court noted, the State and Salish agreed at oral argument that Sound Transit was entitled to a declaratory judgment order "stating that I-776 creates no legally binding obligations on Sound Transit to repay bonds early or conduct a re-vote on light rail." CP at 1731.

▮▮▮▮ On this issue of first impression, we reject the superior court's implicit conclusion and hold instead that policy expressions in a bill or initiative measure do not contribute additional "subjects" within the meaning of article II, section 19.[7] Permitting pure policy statements to yield additional "subjects" for article II, section 19 analysis is contrary to the constitutional provision's long-acknowledged purpose of prohibiting logrolling, the aggregate pas-

---

[5] "Also, dramatic changes to transportation plans and programs previously presented to voters must be resubmitted." CP at 370. For the complete text of section 1, see Appendix A.

[6] CP at 1735. Despite terming the provision precatory, the superior court commented on "the use of mandatory language" in the sentence, but the word "must" in this context need not be considered mandatory. *See* WEBSTER'S, *supra*, at 1492 (defining the verb "must" at **1b** as "is urged to: ought by all means to"). That this sentence in section 1 is not mandatory is reinforced by the third sentence in section 7: "The people *encourage* transit agencies to put another tax revenue measure before voters if they want to continue with a light rail system dramatically changed from that previously represented to and approved by voters." CP at 372 (emphasis added).

[7] *See In re Title, Ballot Title & Submission Clause, & Summary for 1999-2000 # 265*, 3 P.3d 1210 (Colo. 2000) (rejecting precatory language as basis for second subject in initiative measure).

sage of two or more unrelated bills in a single vote or election. The constitutional prohibition against legislative vote swapping plainly applies to the passage of two or more "unrelated *laws*"—not to the passage of one law that contains policy expressions indisputably devoid of any legal effect. *Amalgamated*, 142 Wn.2d at 212 (emphasis added). The dissent proclaims that, "[f]or the exact reasons laid out by this court in *Power, Inc.*," article II, section 19 prohibits "combining a mandatory subject with an unrelated nonmandatory one." Dissent at 444. But, as was pointed out above, the court in *Power* defined the combination of an "appropriation bill" and a "corporation income tax bill"— two measures with legal effect—as "the clearest possible illustration" of what article II, section 19 "was designed to prevent." 39 Wn.2d at 198-99. The dissent has, in fact, cited no case in which article II, section 19 has invalidated a piece of legislation on the grounds that its legally binding provisions were accompanied by policy expressions. Rather, the dissent demonstrates that Washington law has consistently viewed the term "subject" in article II, section 19 as referring to laws, measures with legal effect. *See* dissent at 443-44 (stating that "[o]ur constitution protects voters 'from having to vote for a law that they do not favor in order to obtain a law which they do' " (quoting *Amalgamated*, 142 Wn.2d at 191)); dissent at 444 (citing *Wash. Toll Bridge Auth. v. State*, 49 Wn.2d 520, 523, 304 P.2d 676 (1956) (invalidating under article II, section 19 legislation that "empower[ed] a state agency to establish and operate all toll roads" and simultaneously "provide[d] for the construction of a specific toll road")).

The distinction between a proposed measure's legal substance and its policy fluff was tersely drawn in an early opinion of this court: "A law is a rule of action. An argument is not. . . . [A] preface or preamble stating the motives and inducement to the making of [the law] . . . is without force in a legislative sense . . . . It is no part of the law." *State ex rel. Berry v. Superior Court for Thurston County*, 92 Wash. 16, 30-32, 159 P. 92 (1916). Just as the common inclusion of dicta in judicial opinions does not compromise the legal

effect of a decision,[8] policy expressions in a bill or initiative are "no part of the law." Because I-776's "rule of action" was $30 license tabs and because its policy statements were "no part of the law,"[9] I-776 did not embrace two unrelated laws or enactments. Its "operative and relevant sections," as the superior court termed them, were all rationally related to the enactment of a $30 ceiling on license tab fees, and that enactment was not paired with a second bill or measure mandating a revote on light rail. CP at 1728.

Allowing initiative opponents to extract additional "subjects" from an initiative's pure policy expressions—expressions that, by their very nature, are expansive and rhetorical—would not only be contrary to the aim of article II, section 19, but would undermine all but the most tightly worded initiative. Moreover, it would require courts to explain why some policy expressions are "subjects" and others are not. To take an extreme example at hand, the I-776 drafters twice insist in section 1 that "[p]oliticians should keep their promises," thus introducing the topic of politicians' fidelity to their word. CP at 19. While the drafters of the initiative may well have wished to require politicians to keep their promises, the initiative provides no statute or mechanism for bringing about such a utopian notion. In that respect, the precatory language encouraging politicians to keep their promises is no different from the urging of a revote on the changes to previously approved transit plans; both remain items on the drafters' wish list.

Our decision today reaffirms the purpose of the constitutional prohibition against passing separate laws in a single vote or election and forecloses the possibility that a bill or initiative could be declared unconstitutional solely on the grounds that its policy expressions raise other topics. Having determined that precatory language cannot yield addi-

---

[8] "**obiter dictum** . . . . [Latin 'something said in passing'] A judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (though it may be considered persuasive)." BLACK'S LAW DICTIONARY 1100 (7th ed. 1999).

[9] The precatory sentences that the superior court extracted from I-776 are found in sections 1 and 7, which are entitled "Policies and Purposes" and "Legislative Intent Relating to Outstanding Bonds." CP at 370, 372. In contrast, the titles of the sections that the superior court termed "operative," CP at 1728, began with the word "Requiring" or "Repealing." CP at 370-72.

tional "subjects" for article II, section 19 purposes, we conclude that Pierce County has failed to show beyond a reasonable doubt that I-776 required the people to cast a single vote on two unrelated, proposed laws.

b. *The Constitutional Adequacy of the Ballot Title of I-776*

■■■■■■ Having determined that I-776 has only one subject (limiting license tab fees on cars and light trucks), this court must consider the second requirement of article II, section 19—that the subject be expressed in the ballot title. *Wash. Fed'n*, 127 Wn.2d at 555. To be constitutionally adequate, "the title need not be an index to the contents, nor must it provide details of the measure." *Amalgamated*, 142 Wn.2d at 217. It satisfies the constitutional requirement "if it gives notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law." *YMCA v. State*, 62 Wn.2d 504, 506, 383 P.2d 497 (1963). As with the single-subject requirement, the subject-in-title requirement of article II, section 19 "is to be liberally construed in favor of the legislation." *Wash. Fed'n*, 127 Wn.2d at 555.

By statute, the ballot title for an initiative to the people has three parts: "(a) A statement of the subject of the measure; (b) a concise description of the measure; and (c) a question in the form prescribed in this section for the ballot measure in question." RCW 29.79.035(1). The statute further requires that the ballot title "substantially" follow a prescribed format: " 'Initiative Measure No. . . . concerns (statement of subject). This measure would (concise description). Should this measure be enacted into law?' " *Id*. at (2). Moreover, the statute puts a 10-word limit on the "statement of the subject" and a 30-word limit on the "concise description." *Id*. at (1). Consistent with the statute, the ballot title of I-776 expresses the subject in its first sentence: "Initiative Measure No. 776 concerns *state and local government charges on motor vehicles.*" CP at 18 (emphasis added). The second sentence tells what the measure would do: "This measure would *require license tab fees to be $30 per year for motor vehicles, including light trucks. Certain local-option vehicle excise taxes and fees*

*used for roads and transit would be repealed." Id.* (emphasis added).

We see no constitutional defect in this ballot title. Because we have determined that policy language does not yield additional "subjects" for article II, section 19 analysis, the ballot title was not obliged to address the drafters' desire for a revote on changes to Sound Transit's light rail project. Nor was the ballot title required to mention the detail that I-776 would not repeal RCW 46.01.140(4)(a) and (e), which imposed fees totaling $3.50 for license tab applications processed by agents. The ballot title, which used 38 words of the 40 permitted by statute, was sufficiently detailed to prompt an inquiring mind to read the initiative for further details.

In sum, Pierce County has not met its burden of showing beyond a reasonable doubt that I-776's ballot title failed "to notify members of the Legislature and the public of the subject matter of the measure." *Amalgamated*, 142 Wn.2d at 207.

 *I-776's Alleged Impairment of King County's Contracts.* Article I, section 23 of the state constitution provides that "[n]o . . . law impairing the obligations of contracts shall ever be passed." For an impairment to be found, there must be a "contractual relationship," and the law must "substantially impair" that relationship; if these two criteria are met, the law will be declared unconstitutional unless the impairment is "reasonable and necessary to serve a legitimate public purpose." *Tyrpak v. Daniels*, 124 Wn.2d 146, 152, 874 P.2d 1374 (1994).

 The focus here is on the second criterion, substantial impairment. King County asserted, and the superior court agreed, that I-776's repeal of RCW 82.80.020 impaired its contract with certain bondholders. Under that statute, King County (and three other counties) had adopted a $15 local fee for licensing vehicles. King County's bonds were "double-barreled," meaning that the county pledged both the $15 local fee that was a subject of I-776, and the county's "full faith and credit." A full faith and credit pledge is a pledge of all available county resources. King County issued these bonds on October 15, 2002, after

I-776 had qualified for and was about to appear on the November 5, 2002 ballot. Because the bonds were being issued on the eve of the election, King County made the following disclosure in its Official Statement to all bond purchasers:

> [I-776] has qualified for the State-wide ballot for the November 5, 2002 general election. If approved, I-776 would require local option vehicle license fees to be $30 per year and would repeal certain laws allowing governments to impose taxes or fees on motor vehicles for transportation purposes, including annual local option vehicle license fees for transportation purposes. The County currently imposes an annual local option vehicle license fee in the maximum authorized amount of $15.00, which generates approximately $5 million in annual revenues.

CP at 1185; *see Mun. of Metro. Seattle v. O'Brien*, 86 Wn.2d 339, 350, 544 P.2d 729 (1976) (referring to the official statement for the bonds to reconstruct the parties' understanding of the contract because bonds are "sold on the basis of representations contained in [the] Official Statement"). King County's Official Statement went on to make additional disclosures that the county believed appropriate under securities laws, as well as additional express assurances to investors concerning the ability of its full faith and credit pledge alone to provide for bond repayment:

> It is impossible to predict whether I-776 will be approved by the voters, or, if approved, whether it will be implemented in such a way as to prevent the County from imposing or collecting such local option vehicle license fees. However, the County believes that even if I-776 is approved by the voters and implemented, it will nonetheless have sufficient revenues from other revenues and taxes pledged to payment of debt service on the Bonds to pay the principal of and interest on the Bonds when due. *In any event, even if I-776 is approved by the voters and implemented in a manner that precludes the County from imposing the local option vehicle license fee, the County has pledged in the Bond Ordinance to pay debt service on the Bonds from ad valorem property taxes and other revenues, taxes and money of the County legally available for such purposes.*

CP at 1185 (emphasis added). Although King County properly advised the bondholders that it could not predict whether I-776's enactment would prevent the county from

collecting the fee or using it to repay the bonds, the county's additional express assurance that its other revenues would be available and sufficient to repay the bonds can, in the absence of any evidence to the contrary, be deemed to have led investors to rely heavily, if not solely, on the county's full faith and credit pledge.

As this court stated in *Tyrpak*, "the relevant question is whether the legislation detrimentally affects the financial framework *which induced the bondholders originally to purchase the bonds.*" 124 Wn.2d at 153-54 (emphasis added). In *Tyrpak*, the factors inducing bondholders to purchase bonds from the port district did not include reassurances that potential investors need not be concerned about the financial effects of a pending annexation. In fact, no annexation of a portion of the district's land area was imminent at the time the bonds were issued. Rather, the bondholders were induced to purchase the bonds by the district's boundaries and tax base as they existed prior to any legislation annexing its land. In contrast, the record in this particular case establishes that King County's bondholders were informed by the county prior to purchasing the bonds that I-776 was on the ballot and that its passage would repeal the $15 local option vehicle license fee. Unlike the annexation legislation in *Tyrpak*, the initiative measure in the present case was scheduled to be voted upon less than a month after the bonds were issued and would have been of significant interest to potential investors. Another distinguishing fact is the specific language used by King County when it told investors that they could rely on what the county described as a sufficient full faith and credit pledge in the event that the license fee revenues became unavailable.

Given the county's express commitment to the bondholders that they could rely entirely on its full faith and credit pledge, and based solely on the specific facts presented in this case, we cannot conclude that I-776 "substantially impair[ed]" King County's contractual relationship with its bondholders. *Tyrpak*, 124 Wn.2d at 152, 153-54. We therefore hold that Pierce County has failed to show beyond a reasonable doubt that I-776 violates article I, section 23 of the state constitution.

*Additional Constitutional Issues Raised by Pierce County and Sound Transit.* The superior court left some of the plaintiffs' constitutional challenges undecided. Pierce County and Sound Transit renew those issues on direct appeal as alternative grounds for affirming the superior court's decision. *Ertman v. City of Olympia*, 95 Wn.2d 105, 108, 621 P.2d 724 (1980).

First, Pierce County contends that I-776 violates precepts of local home rule set forth in our state constitution under article XI, section 4 (granting local voters the right to create their own governments) and section 12 (denying the state legislature any power to impose taxes on local governments for local purposes). The thrust of this argument is that, by repealing the statutory authority under which some counties had imposed the $15 local option vehicle fee and under which Sound Transit had levied the MVET, I-776 imposed a tax on those local governments by requiring them to find other funding sources for local transportation projects. The argument lacks merit. Article XI, section 12 permits the state to legislate what taxes and fees local governments are authorized to impose: "The legislature . . . may, by general laws, vest in the corporate authorities [of counties, cities, towns or other municipal corporations], the power to assess and collect taxes." Each local government, in its discretion, then decides whether to impose the taxes and fees authorized by the State's general laws. The legislature—or the people legislating by initiative—may rescind by general laws the authority previously granted. When that happens, as here, no violation of article XI, section 12 occurs.

Sound Transit argues that, in repealing the MVET, I-776 exceeded the scope of the initiative power prescribed in article I, section 1 of the state constitution. Sound Transit relies on *Ruano v. Spellman*, 81 Wn.2d 820, 505 P.2d 447 (1973), which concerned the efforts of citizens to stop the Kingdome's construction by filing an initiative under the King County charter. The *Ruano* court determined that only administrative acts remained and that the charter's initiative power did not extend to administrative

acts. *Id.* at 823-25. However, whereas the *Ruano* initiative was a local effort to stop administrative acts of a local government, I-776 is a statewide initiative that repeals a general act of the legislature and has no legal effect on any legislative or administrative act of Sound Transit. As a general law repealing an existing general law (RCW 81.104.160), I-776 does not exceed the scope of the people's constitutionally granted initiative power.

■ Finally, Sound Transit suggests that I-776's repeal of the MVET violated the transit agency's due process rights, guaranteed in article I, section 3 of the state constitution and in the fourteenth amendment to the United States Constitution. The claimed deprivation of "life, liberty, or property" caused by I-776 presupposes that, when a local government decides to embark on a public project, the people of that jurisdiction acquire a vested property right in the completion of the project, regardless of subsequent state law. No authority exists for that proposition. Sound Transit argues vaguely about the voters' due process rights because case law establishes that article I, section 3 does not insulate cities from state action. *See, e.g., Moses Lake Sch. Dist. No. 161 v. Big Bend Cmty. Coll.,* 81 Wn.2d 551, 503 P.2d 86 (1972) (upholding state authority to transfer community college ownership from school district to state without compensation), *appeal dismissed,* 412 U.S. 934, 93 S. Ct. 2776, 37 L. Ed. 2d 393 (1973). Local governments find protection for completion of their public works in article I, section 23, which prohibits passage of any law "impairing the obligations of contracts." Sound Transit has no basis for asserting that I-776 caused a deprivation of a vested property right.

In sum, Pierce County and Sound Transit are unable to establish beyond a reasonable doubt that I-776 violated constitutional precepts of local home rule, exceeded the scope of the initiative power, or deprived the voters of a vested property right.

■ *Salish's Request for Attorney Fees.* Salish requests attorney fees under the "common fund principle" set forth in *Weiss v. Bruno,* 83 Wn.2d 911, 523 P.2d 915 (1974). The

*Weiss* court endorsed the recovery of a reasonable attorney fee where the court is "presented with: (1) a successful suit brought by petitioners (2) challenging the expenditure of public funds (3) made pursuant to patently unconstitutional legislative and administrative actions (4) following a refusal by the appropriate official and agency to maintain such a challenge." *Id.* at 914. Salish cannot show, however, that the continued collection of the $15 local option fee in King and Pierce Counties was an unconstitutional "expenditure of public funds," since it was, first of all, a *collection* of funds and, second, was made pursuant to superior court orders. Additionally, because the State has challenged the collection, the fourth element above would not be met as to that claim. Nor can a basis for an attorney fee award be found in Salish's complaint against Sound Transit (that the transit agency had been formed unconstitutionally and had thus been illegally collecting the MVET under RCW 81.104.160), since that claim was beyond the scope of the proceedings before the superior court.

## CONCLUSION

We hold that I-776 embraced a single subject and expressed that subject in its title, that I-776 did not "substantially impair" King County's contractual obligations to its bondholders, and that the additional constitutional claims that the superior court did not reach were unavailing. We therefore reverse the trial court's grant of summary judgment and remand the matter for proceedings not inconsistent with this opinion. Salish's request for attorney fees at trial and on appeal is denied.

ALEXANDER, C.J., and JOHNSON, MADSEN, SANDERS, and FAIRHURST, JJ., concur.

CHAMBERS, J. (dissenting) — I disagree with the majority that merely because some subjects are not "operative," multiple unrelated subjects embraced by a bill or initiative do not violate article II, section 19 of the Washington State Constitution. Therefore, I respectfully dissent.

This initiative embraces at least two subjects. First, it limits the amount state and local governments may charge for motor vehicle licensing. Initiative Measure 776 (I-776) §§ 2, 3, 4, 6 & 8. Second, it calls for four counties to halt development of a voter-approved light rail transit system until the funding mechanisms are revisited and reapproved. I-776 §§ 1, 7. These subjects are not rationally related, and therefore the initiative violates our constitution.[10]

Our constitution requires that "[n]o bill shall *embrace* more than one subject, and that shall be expressed in the title." CONST. art. II, § 19 (emphasis added). The purpose of article II, section 19 is the prevention of "hodgepodge" legislation and "logrolling." *Power, Inc. v. Huntley*, 39 Wn.2d 191, 198, 235 P.2d 173 (1951); *Wash. Toll Bridge Auth. v. State*, 49 Wn.2d 520, 525, 304 P.2d 676 (1956). It prevents the " 'crying evil' " of " 'confusion and distraction of the legislative mind by the jumbling together of incongruous subjects' " and " 'corrupt combinations of minorities with different interests to force the passage of bills with provisions which could never succeed if they stood on their separate merits.' " *Power, Inc.*, 39 Wn.2d at 199 (quoting *Commonwealth v. Barnett*, 199 Pa. 161, 172, 48 A. 976 (1901)).

Our founders wisely required each bill to pass or fail on its own merits. Ill-conceived legislation should not pass simply because it is packaged with popular legislation. Our constitution protects voters "from having to vote for a law

---

[10] Section 1 of the initiative provides that "dramatic changes to transportation plans and programs previously presented to voters must be resubmitted." Initiative Measure 776 § 1 (I-776). Section 7 provides:

If the repeal of taxes in section 6 of this act affects any bonds previously issued for any purpose relating to light rail, the people expect transit agencies to retire these bonds using reserve funds including accrued interest, sale of property or equipment, new voter approved tax revenues, or any combination of these sources of revenue. Taxing districts should abstain from further bond sales for any purpose relating to light rail until voters decide this measure. The people encourage transit agencies to put another tax revenue measure before voters if they want to continue with a light rail system dramatically changed from that previously represented to and approved by voters.

I-776 § 7; Clerk's Papers at 372.

that they do not favor in order to obtain a law which they do." *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 191, 11 P.3d 762, 27 P.3d 608 (2000) Bad motive on the part of the proponents is not required. Our constitution simply prohibits all logrolling.

We considered a similar issue nearly half a century ago. *Wash. Toll Bridge Auth.*, 49 Wn.2d 520. There, this court considered whether a bill that (1) created a comprehensive financing system for toll roads and (2) specifically established a toll road violated article II, section 19. We found that it did because establishing a particular road "is not germane to the purpose of creating an authority for the establishment of toll roads generally." *Wash. Toll. Bridge Auth.*, 49 Wn.2d at 524; *accord Amalgamated Transit*, 142 Wn.2d at 217 (no rational relation between $30 license tabs and continuing methods of approving future taxes). Similarly, $30 license tabs across the entire state are not germane to the financing of a four-county transit system.

We are faced with a novel twist in this case, whether the proponent of a bill can escape the clear purpose of article II, section 19 by combining a mandatory subject with an unrelated nonmandatory one. For the exact reasons laid out by this court in *Power, Inc.*, I would hold that it cannot. Allowing a hodgepodge of subjects, even nonoperative ones, creates the very "evil [of] confusion and distraction" article II, section 19 prohibits. *Power, Inc.*, 39 Wn.2d at 199. Our constitution does not prohibit more than one "operative" subject; it is broader in its scope. Our constitution prohibits any bill from "embracing" more than one subject. I have found no exception in the text or jurisprudence of our constitution.[11]

---

[11] *Amalgamated Transit*, 142 Wn.2d at 212 is not contrary. *Amalgamated Transit* held that I-695 violated article II, section 19 for containing unrelated *laws*. But all laws must start as bills. CONST. art. II, § 18. The question before us was not present in *Amalgamated Transit*. Colorado precedent is not persuasive, as its constitution, while similar, is procedurally quite distinct and its case law has taken a different analytical approach to this problem. *Compare In re Title, Ballot Title & Submission Clause, & Summary for 1999-2000 # 265*, 3 P.3d 1210 (Colo. 2000) *with Amalgamated Transit*, 142 Wn.2d 183. Further, *In re Title* was decided

The evils of logrolling are not eliminated (though they may be diminished) merely because some text is inoperative. Further, the proponents of future legislation will be encouraged to add inoperative subjects to sell their proposal with empty (and probably unfunded) promises. Results could range from whimsical to menacing. A group seeking the decriminalization of certain drugs would be wise to seek votes from older voters by adding an inoperative subject demanding legislation legalizing the production of generic versions of currently patented and highly priced drugs to reduce the costs of medications. The same group might seek votes from tax foes by demanding legislation repealing the sales tax on all pharmacologically related products. A section demanding an increase in business and occupation tax on pharmacies to support local police departments might garner the votes of supporters of law enforcement. Arguably there is rational unity among these proposals because they all embrace one subject: drugs. *Cf. Kueckelhan v. Fed. Old Line Ins. Co.*, 69 Wn.2d 392, 404, 418 P.2d 443 (1966) (holding that "[t]he relationship between fire insurance regulation and rating, fire loss, fire prevention, and fire investigation is rational and reasonable."). But the confusion and distraction will not serve our State and is prohibited by our constitution. The potential and temptations for creative logrolling have few limits. Our constitution, read properly, forbids embracing two subjects in one bill whether the subjects are operative or not.

I agree with the majority that mere "policy fluff" does not create a second subject. But this case is not about mere policy fluff, or broad statements of purpose. This case is not about preambles, and we have no occasion to consider whether truly precatory language, properly constrained to a preamble, can create a second subject. I am inclined to think it would not. *Cf. State ex rel. Berry v. Superior Court for Thurston County*, 92 Wash. 16, 30-32, 159 P. 92 (1916)

---

by the Colorado Supreme Court as essentially an advisory opinion, without the benefit of opposing argument.

(holding nonbinding language in a preface or preamble is no part of the law).

Preambles, at their best, are eloquent statements of purpose that exhort and explain. *E.g.*, WASH CONST. pmbl.; U.S. CONST. pmbl. They are aids to interpretation that, used properly, add much to our law. *See* BLACK'S LAW DICTIONARY 1194 (7th ed. 1999); *see also In re Bale*, 63 Wn.2d 83, 86-87, 385 P.2d 545 (1963) (harmonizing broad preamble with specific operative requirements of Workers' Compensation Act).[12] While I agree that drawing the line between preambles and nonoperative subjects may present hard questions in the future, I-776 does not present a close case. Also, this is not unknown territory in this court, it has long been called upon to determine what is preamble and what is operative law. *See, e.g., Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 585 P.2d 71 (1978); *State ex rel. Griffiths v. Superior Court for Thurston County*, 92 Wash. 44, 45, 159 P. 101, 162 P. 360 (1916).

But this case is not about mere policy fluff and preambles. Instead, this case is about specific, if nonmandatory, direction to public officers to take specific action in the body of a bill. While operative language certainly trumps precatory language, it does not follow that specific, if inoperative, language in the body of a bill is meaningless. It may embrace a second subject.

When an initiative embodies two unrelated subjects, it is impossible for the court to assess whether either subject would have received majority support if voted on separately. We have no way of determining whether a majority of voters would have voted to limit license tabs without the opportunity to express their displeasure of light rail. Consequently, the entire initiative must be voided, and there is no need to reach the remaining contentions. *E.g., City of Burien v. Kiga*, 144 Wn.2d 819, 825, 31 P.3d 659 (2001).

---

[12] I note that preambles may be improperly used. This court has struck from the ballot supposed preambles that contained controvertible, argumentative statements. *See State ex rel. Griffiths v. Superior Court for Thurston County*, 92 Wash. 44, 159 P. 101, 162 P. 360 (1916).

## CONCLUSION

Article II, section 19 forbids the proponents of bills from engaging in the age-old practice of mixing unrelated subjects into a single bill to make them all more palatable. The substantive requirements of our constitution may not be eluded by merely making one subject inoperative. I respectfully dissent.

IRELAND and BRIDGE, JJ., concur with CHAMBERS, J.

## APPENDIX A

Section 1 of I-776, "POLICIES AND PURPOSES," reads as follows:

This measure would require license tab fees to be $30 per year for motor vehicles and light trucks and would repeal certain government-imposed charges, including excise taxes and fees, levied on motor vehicles. Politicians promised "$30 license tabs are here to stay" and promised any increases in vehicle-related taxes, fees and surcharges would be put to a public vote. Politicians should keep their promises. As long as taxpayers must pay incredibly high sales taxes when buying motor vehicles (meaning state and local governments receive huge windfalls of sales tax revenue from these transactions), the people want license tab fees to not exceed the promised $30 per year. Without this follow-up measure, "tab creep" will continue until license tab fees are once again obscenely expensive, as they were prior to Initiative 695. The people want a public vote on any increases in vehicle-related taxes, fees and surcharges to ensure increased accountability. Voters will require more cost-effective use of existing revenues and fundamental reforms before approving higher charges on motor vehicles (such changes may remove the need for any increases). *Also, dramatic changes to transportation plans and programs previously presented to voters must be resubmitted.* This measure provides a strong directive to all taxing districts to obtain voter approval before imposing taxes, fees and surcharges on motor vehicles. However, if the legislature ignores this clear message, a referendum will be filed to protect the voters' rights.

Politicians should just do the right thing and keep their promises.

CP at 370 (emphasis added).

APPENDIX B

Section 7, "LEGISLATIVE INTENT RELATING TO OUTSTANDING BONDS," provides as follows:

If the repeal of taxes in section 6 of this act affects any bonds previously issued for any purpose relating to light rail, the people *expect* transit agencies to retire these bonds using reserve funds including accrued interest, sale of property or equipment, new voter approved tax revenues, or any combination of these sources of revenue. Taxing districts *should* abstain from further bond sales for any purpose relating to light rail until voters decide this measure. The people *encourage* transit agencies to put another tax revenue measure before voters if they want to continue with a light rail system dramatically changed from that previously represented to and approved by voters.

CP at 372 (emphasis added).

After modification, further reconsideration denied March 9, 2004.